**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| JO ANN WOODBURY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 9:15-cv-2635-DCN |
| vs. ) | |
| ) | **ORDER** |
| CAROLYN W. COLVIN, *Acting* ) | |
| *Commissioner of Social Security*, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

This matter is before the court on United States Magistrate Judge Bristow Marchant's Report and Recommendation ("R&R") that this court affirm Acting Commissioner of Social Security Carolyn Colvin's (the "Commissioner") decision denying plaintiff Jo Ann Woodbury's ("Woodbury") claims for disability insurance benefits ("DIB"). Woodbury filed objections to the R&R. For the reasons set forth below, the court adopts the R&R and affirms the Commissioner's decision.

## I.  BACKGROUND

### A.     Procedural History

Woodbury filed an application for DIB on January 5, 2012, alleging disability beginning December 1, 2011. The Social Security Administration denied Woodbury's claim initially and on reconsideration. Woodbury requested a hearing before an Administrative Law Judge ("ALJ") and ALJ Carl B. Watson held a video hearing on December 17, 2013. The ALJ issued a decision on March 7, 2014, finding that Woodbury was not disabled under the Social Security Act. Woodbury requested Appeals Council review of the ALJ's decision. The Appeals Council declined to

1

review the decision, rendering the ALJ's decision the final action of the Commissioner.

On July 2, 2015, Woodbury filed this action seeking review of the ALJ's decision. The magistrate judge issued an R&R on June 13, 2016, recommending that this court affirm the ALJ's decision. Woodbury filed objections to the R&R on June 30, 2016, and the Commissioner responded to Woodbury's objections on July 18, 2016. The matter is now ripe for the court's review.

### B.     Medical History

Because Woodbury's medical history is not directly at issue here, the court dispenses with a lengthy recitation thereof and instead notes a few relevant facts. Woodbury was 54 years old at the time of her alleged disability onset date. She communicates in English and has a high school education with two years of college.

### C.     ALJ's Decision

The ALJ employed the statutorily required five-step sequential evaluation process to determine whether Woodbury was disabled between December 1, 2011, and December 31, 2015, the date Woodbury was last insured under 20 CFR § 404.1520(g). At step one, the ALJ determined that Woodbury had not engaged in substantial gainful activity during the relevant period. Tr. 14. At step two, the ALJ found that Woodbury suffered from the following severe impairments: (1) osteoarthritis, (2) fibromyalgia, (3) diabetes mellitus, (4) hypertension, and (5) obesity. Id. At step three, the ALJ determined that Woodbury's impairments did not meet or equal any of the listed impairments in the Agency's Listing of Impairments ("the Listings"). Tr. 16–17; see 20 C.F.R. § 404, Subpt. P, App'x 1.

Before reaching the fourth step, the ALJ determined that Woodbury had the residual functional capacity ("RFC") to perform medium work, as defined by 20 C.F.R. § 404.1567(c), with certain restrictions. Tr. 18–22. More specifically, the ALJ determined that Woodbury must avoid working at unprotected heights and could never climb ropes, ladders or scaffolds, but could occasionally climb ramps and stairs, kneel, crouch and crawl. Id. At step four, the ALJ found that Woodbury was able to perform her past relevant work as a customer service representative and insurance agent. Id. at 22. Therefore, the ALJ concluded that Woodbury was not disabled. Id.

## II. STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's R&R to which specific, written objections are made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the conclusions of the magistrate judge. See Thomas v. Arn, 474 U.S. 140, 149–50 (1985). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court. Mathews v. Weber, 423 U.S. 261, 270–71 (1976).

Judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Id. (internal citations omitted). "[I]t is not within the province of a reviewing court to

determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]," not on the reviewing court. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citation omitted). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987)

### III.  DISCUSSION

Woodbury objects to the R&R on two grounds, arguing that the magistrate judge erred in finding that: (1) the ALJ properly explained his decision to attribute "significant weight" to examining physician Dr. James Way's ("Way") opinion, even though certain portions of that opinion undermine the ALJ's finding that Woodbury's mental impairments were not severe, and (2) the ALJ did not err in failing to address Woodbury's GAF scores. The court will address each objection in turn.

#### A.  Way Opinion

Woodbury first argues that the ALJ erred in finding that Woodbury did not suffer from any severe mental impairments without explaining how he weighed certain language in Way's examination report indicating that Woodbury had a history of depression and, at the time, was "experiencing difficulty concentrating and initiating tasks secondary to depression." Pl.'s Objections 1–8 (quoting Tr. 349). The magistrate judge found that the ALJ sufficiently accounted for this component of

4

Way's opinion, and that the ALJ was not required to examine every specific piece of evidence in his decision.[1]  R&R 7–8.

"The Commissioner has the duty to set forth and analyze in his decision all relevant evidence and to explain the weight given to all probative evidence." Solesbee v. Astrue, No. 2:10-cv-1882, 2011 WL 5101531, at *2 (D.S.C. Oct. 25, 2011).  This duty is necessary to ensure that the court is able to conduct a meaningful review of the ALJ's decision.  See DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983) (recognizing that "judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator."); Alexander v. Astrue, No. 4:08-cv-3384, 2010 WL 1254945, at *5 (D.S.C. Mar. 23, 2010) ("If the ALJ does not analyze all the evidence and fully explain the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine the conclusions reached are rational.").  Remand is appropriate when an ALJ's decision fails to provide enough information to enable the court to determine whether the decision is supported by substantial evidence.  Brown ex rel. McCurdy v. Apfel, 11 F. App'x 58, 60 (4th Cir. 2001); see also Mascio v. Colvin, 780 F.3d 632, 640 (4th Cir. 2015) (recognizing ALJ's failure to explain how he

---

[1] The Commissioner adds little to this discussion, and simply refers the court to her briefing before the magistrate judge.  Def.'s Reply 1.  That briefing argues that the ALJ may give weight to a physician's opinion without acknowledging and accepting every observation contained in that opinion.  Def.'s Br. 18–19.  The Commissioner also highlights the ALJ's consideration of an unrelated portion of Way's opinion and argues that Way's opinions were supported by substantial evidence in the record.  Id. at 20–24.  These arguments do not squarely address the issue at hand—the ALJ's duty to explain his consideration of portions of Way's opinion that do not support his conclusion, especially given the ALJ's decision to give Way's opinion "significant weight."  Tr. 21.

decided to credit some of the claimant's statements and discount others requires remand).

Still, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)). Instead, an ALJ "need only 'minimally articulate' his reasoning so as to 'make a bridge' between the evidence and his conclusions." Jackson v. Astrue, No. 8:08-cv-2855, 2010 WL 500449, at *10 (D.S.C. Feb. 5, 2010) (quoting Fischer v. Barnhart, 129 F. App'x 297, 303 (7th Cir. 2005)). The touchstone for determining what evidence must be addressed is whether the evidence is so material that failing to address it would prevent the court from determining if the ALJ's decision was supported by substantial evidence. Seabolt v. Barnhart, 481 F. Supp. 2d 538, 548 (D.S.C. 2007) ("The ALJ is not required to discuss every piece of evidence, but if he does not mention material evidence, the court cannot say his determination was supported by substantial evidence.").

Here, the disputed portions of Way's report are not so material that the ALJ's failure to explicitly discuss them warrants remand. Way performed a mental status evaluation on May 9, 2012, which included a Mini-Mental Status Examination, and an assessment of Woodbury's personal history, medical history, psychiatric history, activities of daily living, and other facts observed during the course of the evaluation. Tr. 347–49. Way then drew certain conclusions from this examination and assessment. Tr. 349. The final section of Way's report, entitled "Assessment Results and Conclusions," reads as follows:

> On the MMSE, [Woodbury] obtained a total score of 29 points, of 30 maximum points. This score falls in the range of normal cognitive functioning. [Woodbury] was able to recall two of three words after an interval of several minutes. She provided accurate responses to all other MMSE items. Additionally, [Woodbury] was able to provide accurate responses to items measuring abstract reasoning processes and social comprehension and judgment.
>
> [Woodbury] possesses adequate intellectual skills to perform basic self-care tasks and other instrumental activities of daily living. She is capable of learning a variety of occupational tasks. However, she has a history of recurrent depression. She is currently experiencing difficulty with concentrating and initiating tasks secondary to depression. These factors may well create inconsistent functioning with instrumental activities of daily living and with occupational tasks. As noted above, [Woodbury] had missed days from work in the past secondary to depression. She would benefit from comprehensive psychiatric treatment. She is not receiving treatment by psychiatric professionals at this time. A psychological therapy component to [Woodbury's] treatment regimen may well prove beneficial . . . and reduce the impact that psychiatric symptoms have on functional capacity.
>
> [Woodbury] is able to understand the spoken word, to follow the flow of the conversation, to follow simple instructions, and to avoid common physical dangers. She appears capable of directing funds management and of performing the mechanics of typical business affairs. She possesses adequate cognitive skills to make appropriate adjustments and decisions in an occupational setting. Although her social functioning is limited at the current time, she appears to possess adequate social interaction skills.

Id. at 349.

Woodbury argues that Way's references to her "difficulty concentrating and initiating tasks secondary to depression" and the language that follows, constitutes a clear finding of a significant impairment in her emotional health. Pl.'s Objections 2. Woodbury explains that Way evaluated three areas of mental health—"the cognitive, the social, and the emotional"—and asserts that this language clearly reflects Way's opinion of her emotional health. Id.; Pl.'s Reply 5.

7

The court is not convinced of this interpretation.[2] First, Way's analysis does not appear to distinguish between "the cognitive, the social, and the emotional" aspects of mental health. Way does not organize his report into categories of cognitive, social, and emotional health, and while Way explicitly finds that Woodbury possesses adequate "cognitive" and "social skills," he never mentions "emotional skills." Tr. 349. Moreover, the language that Woodbury interprets as a finding of emotional impairment comes in a paragraph that begins with a discussion of Woodbury's "intellectual skills" and her ability to perform various tasks, then notes that she has some difficulty "concentrating and initiating tasks," and concludes by opining that she would benefit from therapy. Id. While Way recognized that Woodbury was "currently experiencing difficulty with concentrating and initiating tasks" due to her depression, it is notable that Way also observed that Woodbury's "persistence and concentration were adequate" during her examination. Id. When Way's report is read in its entirety, it is difficult to interpret the recognition of Woodbury's depression related "difficulties" as anything more than one piece of evidence Way considered in reaching his broader conclusions that Woodbury was "capable of directing funds management and of performing the mechanics of typical business affairs," and possessed "adequate cognitive . . . [and] social interaction skills." Id.

---

[2] Insofar as Way's report might be read to find that Woodbury suffered a severe impairment, the court notes determining the severity of an impairment is the exclusive province of the ALJ. 20 C.F.R. § 404.1527 ("We use medical sources . . . to provide evidence, including opinions, on the nature and severity of your impairment(s)."). Thus, if Way's purported finding was entitled to any consideration, it was only as evidence of a severe impairment.

The court further finds that this evidence was not so significant that the ALJ's failure to explicitly address it precludes this court from determining whether the ALJ's decision was supported by substantial evidence. As an initial matter, the ALJ did note that Way's report indicated that Woodbury "experienced increased depressive and anxious symptoms when she was not taking medications" and that Way diagnosed Woodbury with "recurrent moderate depression." Tr. 15. This observation appears to be based on Way's discussion of Woodbury's symptoms in the "Psychiatric History" section of his report, which notes that Woodbury has experienced "decreased interest in activities," "decreased concentration," "decreased energy level," and needed "a great deal of effort [] to engage in various life tasks." Id. at 348. These observations also appear to be the basis for Way's statement that Woodbury "is currently experiencing difficulty with concentrating and initiating tasks secondary to depression." Id. at 349. At the very least, then, the ALJ indicates that he evaluated the same treatment notes that Way relied on in discussing Woodbury's depression-related symptoms. The court finds that this connection sufficiently "bridges" the ALJ's conclusions with the evidence in dispute. See Jackson, 2010 WL 500449, at *10 ("[A]n ALJ is not required to provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning so as to 'make a bridge' between the evidence and his conclusions." (quoting Fischer, 129 F. App'x at 303)).

The ALJ then explained that he assessed the severity of Woodbury's medically determinable mental impairments by evaluating their effects on "the four broad functional areas set out in the disability regulations for evaluating mental

9

disorders and in section 12.00C of the [Listings]." Id. at 16. This procedure was consistent with the "special technique" required by the regulations when evaluating mental impairments. See 20 C.F.R. § 404.1520a; 20 C.F.R. § 416.920a. The ALJ concluded that Woodbury had: (1) no limitation in her activities of daily living; (2) no limitation in social functioning; (3) no limitation in concentration, persistence, or pace; and (4) experienced no episodes of decompensation lasting for an extended duration. Tr. 16. Having found that Woodbury had no more than mild limitations in the first three functional areas, and no episodes of decompensation, the ALJ concluded that Woodbury's mental impairments were not severe. Id.

The ALJ's treatment of Woodbury's "depressive and anxious symptoms" is therefore rather straightforward: the ALJ did not think these symptoms evidenced any limitations in the four functional areas used to assess the severity of a claimant's mental impairments. This view is supported by substantial evidence. Although Way stated that Woodbury's depression symptoms "may well create inconsistent functioning with the instrumental activities of daily living and with occupational tasks," he never affirmatively stated that Woodbury's symptoms actually impaired any of the four functional areas. Id. at 349. To the extent Way's statement may have indicated potential threats to Woodbury's functional capacity in the areas of "daily living" and "concentration, persistence or pace," Way also stated that "[Woodbury's] [p]ersistence and concentration were adequate,"[3] and that she "possess[ed] adequate intellectual skills to perform basic self-care tasks and other instrumental activities of

---

[3] Though this statement was made in the "Observations" section of Way's report, it was immediately followed by a statement that "[t]he assessment results are believed to be a valid estimate of her current functional capacity." Tr. 349.

daily life." Id. Thus, the court finds that the ALJ was reasonable in concluding that Way's discussion of Woodbury's "depressive and anxious symptoms" did not indicate any limitations in the four functional areas evaluated under 20 C.F.R. §§ 404.1520a and 416.920a.

The court does not doubt that the disputed language in Way's report could be viewed as evidence of functional limitations, but even on this view, the evidence is quite marginal. Ultimately, the court finds that the disputed language was not so inconsistent with the ALJ's evaluation of Way's report that the court is left to wonder how the ALJ reached his conclusions. The court is capable of determining how the ALJ reached his conclusions and whether such conclusions were supported by substantial evidence. Moreover, the court finds that such conclusions were, in fact, supported by substantial evidence. Therefore, Woodbury's first objection fails.

### B.     GAF Scores

Woodbury next argues that the ALJ erred in failing to address her Global Assessment of Functioning ("GAF") scores. Pl.'s Objections 8–12. The Commissioner argues that a failure to specifically discuss a claimant's GAF scores does not render an RFC assessment invalid. Def.'s Br. 26–27. The magistrate judge found that even though the ALJ did not explicitly discuss the GAF scores, "it was clear that the ALJ considered this evidence." R&R at 11.

"A GAF score represents a clinician's judgment of an individual's overall level of functioning." Kennedy v. Colvin, 2016 WL 890602, at *3 (W.D.N.C. Mar. 8, 2016). GAF scores range of 0 to 100, with a higher score representing a higher level of functioning. Parker v. Astrue, 664 F. Supp. 2d 544, 549 n.3 (D.S.C. 2009). "A

GAF score of 41-50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job).'" Gordon v. Colvin, No. 1:15-cv-3736, 2016 WL 4578342, at *19 (D.S.C. Aug. 3, 2016) (quoting American Psychiatric Association: Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR")), report and recommendation adopted, 2016 WL 4555965 (D.S.C. Sept. 1, 2016).  "The psychiatric community has moved away from the use of the GAF scale and omitted it from the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("D5M-5")." Id. (citing American Psychiatric Association: Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013).  Nevertheless, the Social Security Administration issued a directive in 2013 that reaffirmed the use of GAF scores as medical evidence.  SSA, AM-13066, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication" (effective July 22, 2013).  The directive provides, in part:

> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR § 416.927(a)(2).  An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by 20 CFR § 416.927(c), and SSR 06-03p, while keeping the following in mind:
>
> The GAF is unlike most other opinion evidence we evaluate because it is a rating.  However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight.  By itself, the GAF cannot be used to "raise" or "lower" someone's level of function.  The GAF is only a snapshot opinion about the level of functioning.  It is one opinion that we consider with all the evidence about a person's functioning.  Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it

> does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.
>
> [ . . . ]
>
> When case evidence includes a GAF from a treating source and you do not give it controlling weight, you must provide good reasons in the personalized disability explanation or decision notice.

Id.

Woodbury argues that this directive requires explicit consideration of a claimant's GAF scores, and that failure to comply with the directive constitutes reversible error. However, courts in this circuit are split on the effect of AM-13066. Compare Kennedy, 2016 WL 890602, at *4 (relying on AM-13066 in finding that the ALJ's decision was not supported by substantial evidence when "[t]he ALJ failed to provide any indication that he even considered the GAF scores much less any discussion or explanation regarding his treatment of the scores") with Clemins v. Astrue, 2014 WL 4093424, at *1 (W.D. Va. Aug. 18, 2014) ("Given the questionable probative value of GAF scores, it unsurprising that courts have concluded that 'the failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination.'" (quoting Paris v. Colvin, 2014 WL 534057 (W.D. Va. Feb. 10, 2014))). One court has gone so far as to hold that AM-13066 appears to be an "internal guidance tool" which lacks the force of law and does not provide grounds for reversal. See Rodgers v. Colvin, 2015 WL 636061, at *11 (E.D.N.C. Feb. 13, 2015).

In addressing this issue, courts in this district have required the ALJ to consider a claimant's GAF scores as evidence, but have not required that the ALJ "explicitly reference" every GAF score. Johnson v. Colvin, No. 6:14-cv-3579, 2016

13

WL 462430, at *7 (D.S.C. Feb. 8, 2016) ("Other than arguing that the ALJ did not explicitly reference every one of Plaintiff's GAF scores, Plaintiff does not show that the ALJ did not adequately consider GAF scores as evidence."); Gordon, 2016 WL 4578342, at *19 (recognizing Johnson and holding that "the ALJ did not err in failing to analyze all of Plaintiff's GAF scores as part of the RFC assessment" when the ALJ's "general findings regarding the severity of Plaintiff's symptoms were consistent with those GAF scores").[4]  This moderate approach also appears to have more support throughout this circuit than either the strict requirement that the ALJ explicitly discuss all GAF scores or the rejection of any requirement to consider GAF scores at all.  See, e.g., May v. Colvin, 2016 WL 4917046, at *5 (W.D.N.C. Sept. 13, 2016) ("Where an ALJ fails to mention a GAF score, but thoroughly reviews the evidence related to such score, such as the medical records in which it is contained, the failure may be harmless."); Emrich v. Colvin, 90 F. Supp. 3d 480, 493 (M.D.N.C. 2015) (finding that "[t]o the extent [the claimant] complains the ALJ ignored Dr. Young's assessment of her GAF score, the ALJ clearly assigned weight to [the

---

[4] The rationales underlying Johnson and Gordon are not entirely consistent. In Johnson, the court found that the ALJ's failure to discuss particular GAF scores was not in error because his decision nevertheless appeared to have consider GAF scores.  Johnson, 2016 WL 462430, at *7.  The Gordon court appeared to adopt this position, Gordon, 2016 WL 4578342, at *19 (finding that the failure to analyze all of the plaintiff's GAF scores was not error, "[i]n light of the court's holding in Johnson"), but also suggested that the failure to "cite particular GAF scores" was harmless error "in that she would have reached the same conclusion if she had examined Plaintiff's GAF scores more closely."  Id.  Nevertheless, because the Gordon court based its holding on both Johnson and its harmless error analysis, this court reads the harmless error analysis as an alternative ground for the decision, rather than an adoption of a legal position that conflicts with Johnson.  Id. ("In light of the court's holding in Johnson and the fact that the ALJ reached the same conclusion she would have reached if she had placed greater emphasis on Plaintiff's GAF scores, the undersigned recommends the court find the ALJ did not err in failing to analyze all of Plaintiff's GAF scores as part of the RFC assessment.")

doctor's] overall medical opinion"); Rodgers v. Colvin, 2015 WL 636061, at *12 (E.D.N.C. Feb. 13, 2015) (finding no error where the "the ALJ did not mention every GAF score contained in the record, [but] 'it [was] evident that he thoroughly evaluated the treatment records' during the time period in question"); Clemins v. Astrue, 2014 WL 4093424, at *1 (W.D. Va. Aug. 18, 2014) (stating that reversing an ALJ's decision for failure to reference a GAF score is "particularly inappropriate 'where the ALJ fully evaluated the records and treatment notes upon which the GAF scores were based'" (quoting Paris, 2014 WL 534057)).  Therefore, the court will evaluate whether the ALJ's analysis reveals consideration of the GAF scores, either directly or indirectly.

All of Woodbury's GAF scores are contained in the records of Dr. Paul Lowe ("Lowe"), who she saw between June and September 2013.  Tr. 431–42.  Lowe's records indicate that Woodbury received GAF scores of 45 on June 21, 2013, 47 on July 12, 2013, and 47 on July 31, 2013.  Id.  Consistent with these low scores, the ALJ recognized that Lowe assessed Woodbury with severe depressive disorder.  Id. at 15, 21.  However, the ALJ noted various findings in Lowe's records that indicated higher functioning than Lowe's diagnosis—and Woodbury's GAF scores—would suggest.  Id.  Based on these inconsistencies, the ALJ determined that Lowe's records supported the ALJ's finding that Woodbury did not suffer from any severe mental impairments, id. at 15, and that Lowe's diagnosis did not affect the RFC assessment, id. at 21.

This analysis suggests that the ALJ at least indirectly considered the GAF scores.  By recognizing Lowe's diagnosis and explaining why that diagnosis was not

15

a reflection of Woodbury's functional capacity, the ALJ appeared to implicitly acknowledge Lowe's determination that Woodbury was functioning at a low level. Low functioning is exactly what a GAF score shows.  Kennedy, 2016 WL 890602, at *3 ("A GAF score represents a clinician's judgment of an individual's overall level of functioning.").  By outlining the inconsistencies in Lowe's treatment notes, the ALJ reviewed the very data Lowe utilized to assign the GAF scores.[5]  Clemins, 2014 WL 4093424, at *2 ("The ALJ fully evaluated the records and treatment notes upon which the GAF scores were based.  The records and treatment notes provided the necessary context for understanding GAF scores.  The numerical scores associated with these records and treatment notes provide little if any additional information.").  Moreover, the ALJ's reasoning is consistent with his having evaluated the GAF scores.  Because "a GAF needs supporting evidence to be given much weight," Emrich, 90 F. Supp. 3d at 493 (citing AM-13066), the ALJ's finding that Lowe's mental status observations undermined the significance of his diagnosis would have been equally applicable to the GAF scores.[6]

---

[5] As the R&R points out, the ALJ actually cites to certain pages that contain the GAF scores.  Tr. 15 (citing to Tr. 432, 422).

[6] Alternatively, this analysis indicates that the ALJ's failure to discuss the GAF scores was harmless error.  An ALJ's error is harmless where the ALJ would have reached the same conclusion notwithstanding the initial error.  Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  Bradley v. Colvin, 2015 WL 5725832, at *4 (S.D.W. Va. Sept. 30, 2015) (quoting Shinseki v. Sanders, 556 U.S. 396, 409 (2009)).  Because "[a] GAF score represents a clinician's judgment of an individual's overall level of functioning" and the ALJ already provided reasons for rejecting any suggestion that Woodbury's functional capacity was diminished in connection with Lowe's diagnosis, it is unclear how an explicit discussion of the GAF scores could have changed the outcome.  Clemins, 2014 WL 4093424, at *2 ("The records and treatment notes provided the necessary context for

Therefore, the court concludes that the ALJ did not err in failing to explicitly address Woodbury's GAF scores.

## IV.   CONCLUSION

Based on the foregoing, the court **ADOPTS** the magistrate judge's R&R, and **AFFIRMS** the Commissioner's decision.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 30, 2016**
**Charleston, South Carolina**

---

understanding GAF scores.  The numerical scores associated with these records and treatment notes provide little if any additional information.").